Good morning, Your Honor. Steve Hobachek, fellow defenders, on behalf of Mr. Ballesteros. Your Honors, I'd like to discuss this morning the sentencing, the deportation, and a portion of the Fourth Amendment issue. I'm going to go to the sentencing issue first because it's the easiest and not in the least impressionistic or holistic. There is a guideline. What's the problem with being impressionistic or holistic? Well, this is easy, though. This is a guideline error. It's controlled by this Court's decision in Lopez-Montanez. It's the same prior conviction. The District Court erroneously in over-objection gave a 16-level increase. This Court reversed that in Lopez-Montanez, so we have a guideline error which results in an 8-level difference. The way I calculate it, it's about a half reduction in the guideline range, down from 51 to 63, down to 21 to 27. So under Cantrell, reversal is required, and it can't be harmless. Unless the Court has any questions on the sentencing, I'll proceed to the merits. The first issue I'd like to address would be the deportation. There's a challenge to the deportation based upon the failure to advise Mr. Ballesteros of his right to apply for the relief of voluntary return. Now, the government in its response brief makes two arguments. It says, number one, that he wasn't eligible because he couldn't show good moral character, and number two, that he didn't show that he had the means to actually repatriate himself. Now, I should back up for a minute. He's from Nicaragua, but the actual deportation order, which I think is at ER 33, well, the written deportation order says that he was willing to go to Mexico as a second residence rather than Nicaragua. So I'm going to assume that he just needs to demonstrate the means to go to Mexico. So first, going to the good moral character issue. The pre-sentence report at page three indicates that as of 1986, he had no criminal record whatsoever. In addition, three months after the deportation order was entered, in November of 1986, the INS exercised its discretion on his behalf to release him on his own recognizance with no bond whatsoever. So I think it strains credulity to argue that it's implausible to say that they would find that he had good moral character on the one hand, but to acknowledge that, in fact, they would release him three months after the deportation order without any conditions whatsoever other than that he report on a regular basis. And that's at ER 156F. So I think that since we only have to show a plausible basis for relief, it is entirely plausible that he could make the showing of good moral character because of the lack of criminal record and because of the INS's own evaluation of him that he was worthy of an OR release. The government's second argument is that he didn't demonstrate he had the means to get himself effectively to Mexico. That also is refuted by the record. If we go to ER 156H, which is an internal INS document that reflects that when Mr. Ballesteros was released OR, that he had sufficient funds to get a bus ticket from Oakdale. I honestly don't know where Oakdale is, but from Oakdale to Houston to San Diego. Now, I know Texas is very big, but if he can afford to get himself from Houston all the way out to San Diego, he certainly could afford to get himself from Houston to Mexico. So there's effectively irrefutable evidence that he had the means with which to voluntarily return himself to Mexico. So neither of the government's arguments that suggest that he wouldn't be eligible for VR hold any sort of water whatsoever. There is an issue, though. Can you challenge the earlier deportation order in sort of a collateral attack at this time, if it wasn't appealed on that basis earlier? Your Honor, the government did raise an exhaustion claim, and I think that's what Your Honor is getting to with that question. The government has the burden under Lopez Vazquez and Ubaldo Figueroa to demonstrate a knowing and intelligent, I guess the actual language in Ubaldo was considered an intelligent waiver of the right to appeal, and there simply is no record that Mr. Ballesteros ever had his right to appeal explained to him. There's no deportation tape here, so there's no record, contemporaneous record, of Mr. Ballesteros receiving any sort of explanation of that right whatsoever. There's no written record that he received any sort of explanation of that right. So under Lopez Vazquez, the government bearing the burden can't possibly prevail on that issue either. Well, are you equating waiver with lack of exhaustion? I think you're now talking about waiver, right? Well, my point, and perhaps I'm responding to the wrong question, my point is that there's an exception to the exhaustion requirement because there is no basis on this record to find a considered and intelligent waiver of the right to appeal the initial 1986 deportation ruling, and that's because there's no record here that demonstrates a knowing and intelligent waiver. In fact, Lopez Vazquez, there was actual, actually the judge told all the individuals that they had a right to appeal and provided some explanation of it, but this Court nonetheless found that that was insufficient. Here, we don't have any record at all of any sort of explanation. So my position is that, number one, that violates due process because he was denied judicial review because the government can't demonstrate a waiver, and number two, it satisfies any exhaustion requirement that may be imposed by 1326D because of the Ubaldo case and the Lopez Vazquez case. So the bottom line is that if he had appealed the voluntary return determination, he had a very plausible chance of winning because he was both eligible and the government can't demonstrate a valid waiver. With respect to the Fourth Amendment issue, unless there are any other questions on the deportation, the Fourth Amendment issue... What's bothering me, Mr. Hubachek, is whether in every one of these illegal reentry cases, we have to have like a retrial of whether a prior deportation proceeding was valid when it wasn't appealed at that time. I understand that concern, Your Honor, and I've handled a lot of these cases, and in the vast majority of them, you've got a deportation tape that explains the right to appeal to the individual who's in the proceedings. That's number one. Number two, in addition to that explanation that's included on the tape, there's often a form that's provided to them that explains their right to appeal, and then there's indications on the record that there was a translation and so on and so forth. So this is by no means a floodgate-type issue. We've got a relatively unique fact pattern here where you've got a deportation hearing that doesn't have a tape, you've got a hearing that never actually was even reduced to a final typewritten order, and number three, there weren't any documents offered to show that Mr. Ballesteros was advised of his right to appeal. So by no means is this a slippery slope. This is an application of well-established case law in Ebaldo, Figueroa, and Lopez-Vazquez. Okay. Thank you. Proceeding on to the Fourth Amendment issue, I'd like to focus on the district court's findings with respect to the entry. What happened here is that there was a two-tiered attack on the entry into Mr. Ballesteros' home. The defense argued, number one, that there was no consent to enter the home, and number two, it argued if there was consent, it was gotten by way of a ruse, which is not proper under this Court's decisions in Phillips and Bossie. Now, what happened in this case was that agents came to the door. It's, like, 630 in the morning, and the 16-year-old son is the person who answers the door. There's disputes about what was said between the agent and the son, but the son goes upstairs, gets the mother. The mother comes downstairs. Now, here's where the parties' accounts diverge. The agent testified, I didn't tell the son anything about the ruse, which is that there was some accident involving a vehicle, and he also says that I didn't enter. The mother, according to the agent, was the person who actually gave him consent to enter. So that's the agent's account. By the way, the agent also said that it was the mother that answered the door, but then he changed his testimony later on. So anyway, agent's account is no mention of the ruse, mother lets me in. Okay, the son testifies, the 16-year-old son testifies that the agent came to the door and he told me the ruse story, that there was this accident. So then he goes upstairs, leaves the door open, says he did not give permission for the agents to enter. He goes upstairs, and then the mother comes downstairs. Now, the mother's testimony is that when the son went upstairs, he told her that there are agents downstairs and they've told us about an accident involving the car. So he conveys to her the ruse story that the agent denies providing to him. So his testimony is corroborated by the mother's testimony, which indicates that he told her about the ruse, which he would not have known if the agent was telling the truth. The mother comes downstairs, and her testimony is that the agents were already inside the house and that she never gave them permission. So we have two very significant conflicts. We have a conflict with respect to the ruse story, and we have a conflict with respect to the actual consent to enter. Now, the district court's findings in the case are at pages 139 to 140 of the excerpt of record. The district court never addresses the direct conflict between the testimony of the son and the testimony of the agents. He does say that the agents actually didn't provide the ruse to get into the house, but he never says that the 16-year-old son came in and lied under oath about what happened when he was met with those agents at the door. Now, the district court then goes on to address the consent issue. The consent issue, he says, based on the evidence and testimony that I have heard, as well as the credibility of the witnesses, I find that the special agent did have consent to enter the residence and therefore lawfully was in the residence at the time they arrested the defendant. And that's at ER 140. So we have absolutely no effort to resolve the conflict between the son's testimony and the agent's testimony. And again, the son was corroborated by the mother. And then only an oblique reference to credibility with respect to the consent issue. I think that in this court's cases, Prieto v. and Taylor v. Maddox, that those findings are just completely insufficient, particularly as to the ruse story, because there's just absolutely no reference whatsoever. And if I could just quote from the Taylor v. Maddox case, it says, in making findings, a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings. Well, there's absolutely no recognition here that the testimony of the 16-year-old son and the agent was diametrically opposed. And it certainly isn't a case where, you know, the agent's testimony could easily be credited, because, in fact, he couldn't even get it straight as to who he first met at the door when he initially testified. So it was a very substantial issue and one that the district court failed to resolve. That quote from Taylor, by the way, is at 366 Fed Third at 1007. Assuming we adopt your position, why isn't the error harmless, leaving aside the Miranda issue? The reason that the error isn't harmless is that, in this case, the defense centered around the fact that we had a very irregular deportation proceeding. You've got an order that was never reduced to writing. You've got a guy who is, in my experience, this never happens, a guy who was released O.R. three months after he was supposedly ordered deported, and then he's not physically kicked across the line for ten more years until 1997. So the defense said, look, this is all crazy stuff. This is not proof, beyond a reasonable doubt, of an actual order of deportation. The statements that were taken from Mr. Ballesteros, they included an admission of deportation. So that corroborated the key issue in the case, so it can't be harmless beyond a reasonable doubt. Except that. Are you talking about the statements at the interview room? Yes, yes, I am. So if we, moving on to that then, if adequate Miranda warnings were given, doesn't that render the prior warrantless, the prior improper search harmless? No, not at all. Under Brown v. Illinois, even if there were proper Miranda warnings, and of course we contend that there were not, but even if there were proper Miranda warnings, that in and of itself would not be sufficient to permit admission of the statements. They could still be suppressed under the Fourth Amendment violation. There's a four-factor analysis, one of which is the egregiousness of the violation. If, in fact, we were to win on the Fourth Amendment violation, that would constitute the most egregious Fourth Amendment violation you can have, an actual entry into the home and an arrest within the home. So I think there's a very substantial claim. But, of course, the district court never addressed that in the first instance because it ruled against us on the preliminary issues. If there are no questions, I'd like to reserve my remaining time. Okay. Thank you. Good morning. May it please the Court, Valerie Chu on behalf of the appellant, the United States. This Court should affirm Mr. Balateros's conviction on all grounds. And let me start in the order that Mr. Hubachek has raised the issues. First, in addressing the sentencing issue, I acknowledge that the Cantrell case discusses the need to apply the guidelines accurately. However, the Cantrell case also reminds us that harmless and plain error review also applies. And in this case, the record is clear that the district judge, Judge Whalen in this case, actually did consult the 3553A factors and, in fact, highlighted the ones, the factors that he thought were most salient as to Mr. Balateros, and that was the need to deter future criminal conduct as well as to protect the public. And that's the discussion at his sentencing hearing at pages 417 and 418 of the record. So in this case, it's clear that he did consider the guideline or did consider the 3553A factors, exercised his discretion to choose a sentence that accommodated those factors. He, in fact, mentioned a couple of different facts that were specific to Mr. Balateros, indeed, including the fact that he was given a state of deportation, he had opportunities to apply for further relief, that he allegedly had returned just a month after being deported, after paying for a false Mexican passport and then returning illegally to the United States, and also the fact that he had had a prior felony conviction in evidencing some violence. So based on those factors, the Court did find that under the 3553A factors, particularly deterrence and protection of the public, that the sentence that he imposed, 57 months, was the appropriate one there. Moving on to the issue of the deportation, I think that Judge Gould hit the nail right on the head here when he talked about the finality issue and the issue of when an individual can attack, collaterally attack a prior administrative order, in this case an order of deportation. And that has specifically been addressed by Congress to so as to avoid any possible floodgates by creating the subsection D of 1326, that's 8 U.S.C. 1326, which provides the sort of framework through which the individual has to go through in order to mount a collateral attack on a prior order of deportation. And that includes the requirement that the person weigh the exhaust his administrative remedies. In this case, he could have appealed his deportation order, chose not to. And I would contest Mr. Hubachek's --- Breyer, how do you know that he chose not to? I would contest Mr. Hubachek's characterization that there is simply no evidence in the record that he was advised of his right to appeal and waived it. There is a record that was contemporaneous at the time. It was dated August 18th, 1986. I'm referring to here the memorandum of the oral decision. It indicates that not only was he advised of his right, but that, in fact, he made a decision about that right and he chose to waive that right. That's clearly marked, the reserved is marked, is crossed out. There's a blank that says, if appeal is reserved, it's due by, and a blank line. And that is not filled out. So it indicates that the immigration judge did, in fact, advise Mr. Ballesteros of the right to appeal, got a decision from him in that there was a waiver of that right at the time. So there is evidence, contrary to Mr. Hubachek's characterization, there is evidence, written evidence, and contemporaneous to the time of the deportation hearing. Aside from the exhaustion issue, there's a question of whether or not relief you can see it if there were not contemporaneous evidence of that, that we would be unassured of the fact that he was advised of his rights. If there were not? Yes. Let's assume hypothetically that he, there's no record in this case that he was advised of his rights. Where does that leave us? Your Honor, then, then we would not know in that case that he was advised of his rights and what decision he came to. And therefore, exhaustion would be excused. In that case, Your Honor. Okay. I think we have a different case. So that issue rises or falls on the, on what we see in the memorandum of decision? Well, in this case, that's what we have available to us. Okay. I would note that the cases in Ubaldo that was cited in the Rule 28J letter is not to the contrary. In that case, it's a question of what language it was in. In this case, again, the memorandum evidences some, the exchange that the immigration judge had with Mr. Balesteros. Furthermore, the question is not only does he have a right to bring this sort of collateral challenge, can he prevail on this collateral attack on the prior deportation? Because is there any possible relief from deportation that he had at the time? And, Your Honor, Mr. Hubachek has pointed to a number of things that have arisen in the record since that time. However, it's the question of did, did the immigration judge, could he have demonstrated before the immigration judge at the time all of the different things that he was required to do? And the fact that the PSR, which obviously was created many years later in connection with the sentencing, may have raised a couple of circumstances or facts about him, the fact that later on the order of release on his own recognizance suggests some things about him, doesn't go to the fact that, that it is the question of, well, what could he have demonstrated at the time? And at the time, there was simply nothing that was, was raised in the record below to have supported his claim that a voluntary departure would have been appropriate for him. I would note that on collateral attack, it is the defendant's burden to demonstrate not only that he can bring the collateral attack, but that he has some plausible grounds for relief, not simply that it was out there, that it was possible, but the case law implies that it must be plausible. In this case, it, the record does indicate that he had been released, given validation of a voluntary departure on two previous occasions, and that he was in the country illegally, so to the extent that he was required to show that he was a person of good moral character, he was in the country illegally, there was no evidence that he had any means in terms of what kind of employment he had had, the consistency of that employment, whether he had family ties, any of those things that the defendant brought to the court below to suggest that voluntary departure would have been plausible. And again, it's a discretionary act by the immigration judge.  It would be rare to deny voluntary departure in a, without any criminal record, generally speaking, in this kind of case, wouldn't you say? That typically the immigration judges would look to. Yes. Certainly the factor of what their criminal record was would have weighed in. But again, there's no automatic, well, simply because he had no record, he would have gotten voluntary departure. There's no case that holds that, and that would rob the immigration judge of his discretion, which, of course, is why it is couched as a discretionary grant of relief from what would otherwise be the removability of Mr. Ballesteros in that case. Might I return just for a second to the memorandum of decision to which you're referring? Is that the August 18th, 06? I'm sorry, I said not 06. August 18th, 1986. That's correct. It's two pages. Right. Which, where on the app do you, are you indicating that it shows that his rights were read to him? The top of the second page, it indicates that Mr. Ballesteros made the decision to waive the, I'm sorry, I believe it may be sort of midway down on the second page. Okay. Where it's stricken through. Yes. That. Oh, I see. I see what you're saying. Okay. And that was, apparently both. What says the service slash respondent have waived appeal? Yes, Your Honor, it appears that both parties were asked. The Immigration and Nationalization Service was asked regarding appeal as well as the respondent in that case. And the stricken material is applicant? Sorry? The material that is stricken is applicant? The, Your Honor, if I may go grab that. Yeah. Anyway, that's a. Your Honor, I believe it's a matter of the, which of the parties was identified and the verb tense that is used to appropriate to that. No, it says service slash respondent. And then the next is, is stricken. Is that applicant? Your Honor, that is what it appears to be. Thank you. But Mr. Ballesteros is, in this case, identified as the respondent in this context. Okay. As evidenced by the caption on the first page. And, Your Honor, finally addressing the issue of the Fourth Amendment challenge in this case. And I would submit, Your Honor, is that there is rather a, what would be useful perhaps is a four-part inquiry that addresses this concern. And I believe at least one of those, Mr. Ballesteros has entirely sort of glossed over. And the question that I would submit that the framework could, that could be followed is, first, whether the arrest was unlawful. And in this case, the district court did not clearly err in finding that there was consent to enter. And that the agents entered and arrested Mr. Ballesteros at a place where they had permission to be. The second stage is whether or not, and this is a stage I believe Mr. Ballesteros hasn't really addressed, whether or not the alleged evidence that arose from the alleged illegality, assuming that there was an illegality in this district court, this Court were to so find that the district court clearly erred, assuming that there was some illegality, whether the evidence was a direct product of that illegality. This is a threshold test, even before you get to attenuation, but the threshold matter of, did the evidence come at the exploitation of the alleged illegality? And the alleged illegality is not that there wasn't probable cause, but that the arrest took place, allegedly, in the home without a warrant. And whether or not that in-home arrest was directly connected to what followed, which was the statements taken at the Federal building. Well, the arrest did occur in the home without a warrant, right? Certainly, that's true. So the only question is consent. Yes, Your Honor. And you would concede, I presume, that the agents tried to use a ruse to get in. I would not agree, Your Honor. And I believe that the district court's finding supports that. Because the agents said that when they had been in a car accident, the agents said that after they had actually received consent from Mr. Ballesteros' wife to enter. And that is what the agent testified to consistently at the suppression hearing as well as the trial. I understand your position on that, but there's no question that at some point the district court said, quote, they can use a ruse to gain entry. Yes, Your Honor. That's clearly wrong. Your Honor, I would submit that a careful reading of this Court's ruling in Phillips       It's not correct. It's not correct. It's not correct. It's not correct. And in fact, in Phillips, the Court there discussed that when determining the law enforcement agent's entry into a home to effectuate an arrest, either with or without consent, what that Court cited was that the analysis of 18 U.S.C. 3109, which is called the knock and announce rule, is applicable. And it said that in the context of in that case there wasn't a warrant there. And so it discussed the goals and purposes of 3109, which were to make a – effectuate a safe arrest to protect both the officers and other people in the home, to prevent the destruction of evidence, and well – and as well to preserve privacy. And in that case – How do you deal with Bossie, the later case that builds on Phillips? Your Honor, I would submit, simply going back to Phillips, that that case also cited the case law that provided that a ruse entry was not inappropriate, just determining whether or not there was probable cause to believe the person was in the home. That was the concern in Phillips. Later on in Bossie, the case there is factually, I think, distinguishable from the facts here, because in that case, an agent actually followed in – a Federal agent came along with a State regulatory official, didn't say who he was, didn't describe his purpose there, just sort of glommed on to the regulatory official's name, and the Court found that that was an affirmative misrepresentation as to his identity and his purpose, and that the things that he was able to observe there, which formed the basis for a later search warrant, was – those things could not be used to form the basis of the later search warrant. Consequently – Okay. I understand your factual distinction. What Bossie says, as describes the law, is an officer may, consistent with the Fourth Amendment, conceal his or her identity to obtain an invitation. So far, so good. The undercover entry must be limited to the purposes contemplated by the suspect. And it goes, special limitations apply when a government agent obtains entry by misrepresenting the scope, nature, or purpose of the government investigation. Access gained by a government agent, known to be such by the person with whom the agent is dealing, violates the Fourth Amendment bar, et cetera, et cetera, if the entry is acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation. I mean, that's the law. Yeah. I would submit that – the last phrase there, if the entry is obtained by affirmative misrepresentation, here, there was no entry that was obtained by the government agent. I understand your factual difference, but the district court said law enforcement can use a ruse to gain entry, and I think that statement of law in this context is incorrect under Bossie. Your Honor, I would submit that under Phillips, that ruse entries are preserved as legitimate, and the district court also cited, you know, referred to the knock and talk and the possibilities there that law enforcement agents can go and encounter individuals in their homes like anyone else can. And so – All right. Assume for the moment – if it's true under Bossie, just assume hypothetically that Bossie prohibits use of ruses by law enforcement officers. They have to – then if the district court is incorrect in saying, in its description of the law, then how do we know that the district court analyzed consent correctly? Because it seems to me he's saying, well, it's knock and talk. It doesn't appear to me that the district court may have used the proper analytical framework. Your Honor, I would submit that what the district court's view of the – that the Bossie court's finding was narrower than the district court's statement of the law. Furthermore, the district court found that there wasn't a ruse. And so to the extent that there could be a question if he thought that a ruse was proper and a ruse actually had been applied here, perhaps going down that pathway, he would have been incorrect. However, what he found was that there wasn't a ruse that was engaged in. In fact, later on he discussed the question of consent. So therefore – I would say about counsel's argument that there was a ruse, but it's a two-step ruse. That is to say, the son was told an incorrect statement and the son then went on to tell his mother, and his mother may have given consent based on what she learned from the son. Now, what about that? Your Honor, I would submit that the record doesn't support that – that inference there, because in fact, the son didn't convey to the mother anything about the alleged ruse. I'm looking at here at the record at page 120. What he said, what he told his mother was, some men downstairs want to talk to you. That was it. And so there is an inconsistency in the record here, because the mother says, oh, well, he told me that they told him about an accident with a car. But the son doesn't say that. And what the – No, but the mother does. That's the problem. Doesn't the – well, I'm sorry. Go ahead, Judge Gould. Doesn't the factual analysis run something like this, at least as I understand it? The district court found that there was not a ruse used to gain entry. The agent testified that he didn't use a ruse to gain entry, that he used a ruse after he was already in the house to get the guy to come downstairs. So don't we review what the district court found for whether it's clear error? And how can it be clear error if the agent so testified? Yes, Your Honor. And furthermore, it's supported by the fact that the court said that what he was doing was weighing the credibility of witnesses. I would distinguish here the Taylor case that's been cited, because in that case, in terms of whether or not he ignored significant portions of the record, in that case, there were, I believe, one government witness and two defense witnesses. The court in that case cited one of each, but totally ignored and failed to cite to the third witness, which was in favor of the defense in that case. Here there is no identifying, well, you know, I consider this, but not that or any kind of omission. In this case, the court simply said that he weighed the credibility of the witnesses. He had four witnesses that he heard over the hearing that took place over the course of three or four days, and he took those, exercised his discretion, and he was sitting there hearing their testimony and weighed it to make the finding that there was, in fact, consent. Where's the finding that he didn't, that there was no ruse used? I don't, I don't, at least I don't see it here. What I see is the district court saying using a ruse is okay. Your Honor, I apologize. I may have implied. You can, you can, if you, if you want to call our attention to it, you can let our clerk know after the argument. There's a good case case. It would be in that section, and if it's not there, I apologize that I've misspoken. But I believe that that's, that he, his finding as to consent was appropriate here, again, based on his assessment of the credibility of the witnesses. Well, the key distinction you're drawing is, I mean, if, if there's a ruse to gain entry to the house under any form, that's arguably improper under BOCCE. Your key distinction is that they were, the district court credited the testimony of the mother that she invited the men, although he doesn't really say that specifically. Is that? Yes, Your Honor. But there's no, there's no finding as to this. The critical distinction, whether it happens outside or inside, really isn't discussed by the district court, I don't think. Well, I would, I would disagree. I would, I would submit that when he says they had consent to enter, that they didn't just barge in, that's the sort of time and location that he's discussing there, that it is from the outside to the inside of the home, and that's essentially what is being discussed. And I would think that the, I think that that's consistent with, with Payton and the other case law regarding the Fourth Amendment, that it is the threshold of the home that is what is protected there. But that an individual, an occupant, can decide who they want to have inside the home, and they can invite someone or give consent for someone to come into, into the home without any constitutional violation there. And I submit that that's what happened here. Even if, Your Honor. I made a, I might have made a misstatement in my understanding of it, that I was thinking that the district court found that there wasn't a ruse used to get into the house, but only after they were in, but maybe he just found that there was consent from the wife to get in. Yes, Your Honor. I would submit that that would be correct. Your Honor, even if Your Honors were to find that the district court was clearly erred, I would submit that there's a, there's still a threshold question that hasn't been met as to whether or not the evidence resulted from the alleged illegality, which is the arrest in the home. And I believe that the Harris v. New York case is clearly controlling it and is very helpful in this context. And in that case, the, the Supreme Court said that the exclusionary rule does not bar a State's use of a statement made by the defendant outside of the home, even though the statement is taken after an arrest made in the home in violation of Paget. That case seems squarely applicable to the facts here, where we have a statement that was made later on outside the home. No statements were taken inside the home. No evidence was, was found inside the home that was later used to question Mr. Ballesteros. And in this context, the Harris court has determined that the exclusionary rule does not require that, that evidence be, be excluded because it's not directly a fruit of the alleged illegality, which ---- How do you deal with Brown, the case relied on by Mr. Chomyshek? Your Honor, the same way that the Harris court dealt, dealt with Brown, and it described both Brown and Taylor and Dunaway as cases in which the alleged illegality itself was the lack of probable cause. The agents had no right to get at Mr. Brown or Mr. Taylor, and so the fact that they had the person in custody unlawfully and statements resulted from that, that was a direct connection to the illegality. Now, the Harris court described the difference here as, well, there was probable cause to have the person in custody, so the fact that it was within the home versus outside of the home didn't affect the, the, the analysis as to the, whether or not the, the evidence had to be excluded, and the court found that, that evidence did not, in fact, have to be excluded. The Harris court did draw this distinction between, in Harris, there actually was a confession that was taken at the home, and there was no dispute that that evidence was clearly, should be suppressed and was, in fact, suppressed. And what the court said was that the rule in the pageant was designed to protect the physical integrity of the home, not grant criminal suspects protection for statements made outside the premises where police have probable cause to arrest the suspect for committing a crime. And it is clear from the case law that once valid consent has been given to enter, the, the officers need not turn a blind eye to crime that is committed therein or that they have probable cause to believe has been committed. Consequently, because the statements were not any kind of direct product, and it's certainly not a but-for test, which is sometimes tempting because many courts simply just jump to the attenuation analysis, but there is the threshold question. Is it a result of the arrest in the home versus somewhere else, versus outside, versus anywhere else? And this Court, in the Crawford decision, has applied the Harris sort of threshold test. And again, in an en banc decision, the Crawford court decided that statements taken outside the home later on were not sufficiently connected and so did not have to be suppressed. Roberts. We've taken you way over your time. Are there any further questions of the panel? Very good. Thank you. Thank you, Your Honors. We'll put five minutes back on. I'm going to go in reverse order this time and deal first with the Fourth Amendment. With respect to the facts, the district court never explicitly said that there wasn't a ruse employed. So there really isn't a finding. There's no resolution of the factual dispute. And just so we're all on the same page with respect to the record, the agent testified that he didn't tell the son about the ruse, and that's at ER 74. The son testified that the agent did tell him, and that's at ER 119. And then the mom did say that the son told her about the ruse facts, and that's at ER 126. Now, the district court's ruling where it said it was weighing credibility was only in the context of the notion as to whether or not there was consent. It wasn't with respect to whether or not there was consent by way of the ruse. So the district court never actually resolved that issue. So I think that at a minimum, there needs to be a remand to figure out what the ultimate facts were with respect to the ruse. And it is true that the district court did say on page 139 of the ER that it's okay to enter by way of a ruse. It seemed to me, and what the district court did, and I don't know what your view is, but it looked to me as though the district court was focusing on whether the officers gained entry improperly by assertion of lawful authority rather than by assertion of lawful authority coupled with a ruse. And it seemed to me the district court made findings on that. Well, that's precisely what it said at the bottom of page 139 up to the top of page 140. It's clear from the evidence that I heard that they didn't have the door opened or assert any legal authority in order to get the door open. So I think Your Honor is absolutely correct with respect to that. Now, with respect to the issues as to what the remedy is going to be if, in fact, there is a Fourth Amendment violation, that's what the district court never reached. And I think that that ought to be developed below so that the – whether or not this Court's decision – I think it's the Latham case that was cited as being one that follows Harris, where it was based upon the distinction that the officers were legitimately present in the place that they were. So I think that a remand for that exploration of those issues would be appropriate. Now, turning to the deportation issue, there was a suggestion that the evidence that Mr. Harris was eligible for VR and, in my view, most likely would have gotten it, let alone plausibly would have gotten it, that it somehow came up after the fact. We relied upon the fact that he was released O.R. as one of the factors showing that it was plausible that there would be a finding of good moral character. And that's at page 156F of the excerpt of record. And that order was entered on November 26, 1986. So that's only three months after the handwritten order of deportation. So that's contemporaneous evidence that the INS didn't think he was such a bad guy after all. Now, with respect to whether or not he had the ability and the funds to get himself to Mexico if he were offered a voluntary return, that's at ER 156H. And that is an internal INS document dated December 3, 1986. So again, only three or four months after the deportation hearing. And I actually saw that in that order when I looked at it during Ms. Chu's presentation that he was at FDC Oakdale, Louisiana. So I'm assuming that that means some sort of federal detention camp in Oakdale. So the likelihood that he was earning more money between his deportation hearing in August and the finding by the INS in December of 1986 that he had funds to travel from Louisiana all the way to San Diego is highly unlikely. So it's almost certain that he had that amount of money at the time of his deportation hearing. And finally, with respect to whether or not there was an actual waiver of appeal, the language that's used in the form just basically says, service slash respondent waive the right to appeal. Now, if I were to come up here and say that the agents didn't provide any Miranda warnings, all they did was come up to the guy and say, do you waive Miranda, I don't think that anybody would be saying that that was legitimate. And so what's lacking from the government's evidence here is any sort of explanation of the right. And I'm referring to the language near the bottom of the page of Excerpt of Record 33, the service slash respondent have waived appeal. Ubaldo Figueroa, which is a post-1326D case, so it is applied to the very statute that states that there is no evidence whatsoever that any explanation was provided to Mr. Vallesteros regarding that right. And Lopez-Vasquez says that it's the government's burden to provide that evidence. Unless the Court has any further questions, I'll submit. Thank you both for your arguments. It's been very helpful in this case. Thank you. The case I just heard will be submitted. Next case on the oral argument calendar is Certain Underwriters v. Cravens.
judges: Thomas, Gould, Schwarzer